IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATHAN MOTT,<br><br>            Plaintiff,<br><br>      vs.<br><br>ADP SCREENING & SELECTION SERVICES, INC.<br><br>            Defendant. | Case No. 1:23-cv-03843<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Nathan Mott ("Plaintiff" or "Mr. Mott") by and through his counsel brings the following Complaint against ADP Screening & Selection Services, Inc., ("Defendant" or "SASS") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's potential employer, which falsely portrayed Plaintiff as a convicted murderer.

# INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. Defendant falsely reported to Plaintiff's prospective employer that Plaintiff was **convicted of felony murder while armed**. Defendant's reporting is grossly inaccurate and untrue.

4. The murder conviction belongs to another person who is incarcerated, not Plaintiff.

1

5.      Defendant's inaccurate reporting could have easily been avoided had Defendant reviewed the widely available underlying public court records from Washington D.C. County, Columbia regarding the felony conviction prior to publishing Plaintiff's report to his prospective employer.

6.      Had Defendant performed even a cursory review of the underlying public court records, it would have discovered that the criminal record belongs to a different consumer who is wholly distinguishable from Plaintiff by their social security number and even resides in a different part of the country from Plaintiff.

7.      Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

8.      Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal record information.

9.      Defendant's inaccurate report might have cost Plaintiff a good paying job and job security.

10.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

11. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

12. Nathan Mott ("Plaintiff" or "Mr. Mott") is a natural person residing in Washington, District of Columbia and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13. Defendant ADP Screening & Selection Services Inc., ("Defendant" or "SASS") is a Colorado corporation doing business throughout the United States, including the District of Columbia, and has a principal place of business located at One ADP Boulevard, MS433, Roseland, NJ 07068.

14. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

15. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

18. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

19. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

20. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

21. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

22. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

23. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

24. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

25. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

26. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

### DEFENDANT'S ILLEGAL BUSINESS PRACTICES

28. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

29. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

30. The criminal background check industry takes in revenues in excess of three billion dollars, annually.[2]

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

31. Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

32. Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

33. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

34. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

35. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

36. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

37. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting a felony conviction that belongs to another consumer who has a different social security number and address than Plaintiff.

38. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff Applies for a Job with Didlake, Inc.

39. In or around the end of July 2023, Plaintiff applied for employment with Didlake, Inc ("Didlake").

40. Upon applying to Didlake, Plaintiff successfully completed an interview.

41. On or about August 8, 2023, Plaintiff received a formal offer letter from Didlake which stated that they were offering him the position of Janitorial Supervisor at the White Oak.

42. The job offer was conditioned upon Plaintiff passing a background check ("employment report.")

### Defendant Published an Inaccurate Background Check Report to Didlake

43. Didlake contracted with Defendant to conduct background checks, including criminal background checks, on its prospective employees.

44. On or about August 9, 2023, Didlake ordered a criminal background check on Plaintiff from Defendant.

45. On or about August 11, 2023, in accordance with its standard procedures, Defendant completed its employment report about Plaintiff and sold the same to Didlake.

46. Within that employment report, Defendant published inaccurate information about Plaintiff.

47. Specifically, Defendant's employment report about Plaintiff included a grossly inaccurate and stigmatizing **felony murder conviction** from Washington D.C., which appeared in the employment report as follows:

```
District Of Columbia, Washington Dc County Criminal Record Search
Information from: Washington DC County Courts
Case 1 • Number: 2006 CF1 019902 • File date: 09/09/2006
Names listed in case: Lynch, Jr, Carl Lawrenc; Mott, Nathan
SSNs listed in case: None listed
Dates of birth listed in case: [redacted]
Addresses listed in case: [redacted]

Physical description: Male, Black
    ⚠ Offense 1: Murder While Armed, Felony
    Offense date: Not provided
        10/03/2007 - Guilty
            Sentence: 540 months Jail, Unspecified Amount Credited, 5 years
            Supervised Release, Monetary Assessments
```

48. The felony conviction reported by Defendant about Plaintiff to Didlake ***does not*** belong to Plaintiff.

49. The background report should not have returned *any* criminal records about Plaintiff.

50. A cursory review of the widely available underlying public court records confirms that the record belongs to another person, Carl Laurence Lynch Jr. aka Nathan Mott ("Convicted Felon").

51. Had Defendant actually consulted or obtained the widely available underlying public court records regarding the felony conviction, it would have seen obvious discrepancies between Convicted Felon and Plaintiff.

8

52. The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as Convicted Felon include the following:

    (a) Plaintiff's legal name is "Nathan Mott." Plaintiff has never used any aliases. But the criminal record belonged to a "Carl Lynch," aka "Nathan Mott" which is clearly indicated in the widely available public records from Washington D.C. County;

    (b) Plaintiff's address history confirms that Plaintiff does not live and has never lived at 1600 Frankford Street S.E., yet the underlying public court record regarding the criminal conviction indicates that Convicted Felon lived at the above-mentioned address; and,

    (c) Plaintiff's Social Security number, which was provided to Defendant is contained on the face of the subject employment report is entirely different than that of Convicted Felon.

53. Furthermore, widely available public records indicate that Convicted Felon was incarcerated at the time of the employment application.

54. The sole reason the inaccurate felony conviction was reported as belonging to Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Plaintiff to Plaintiff's prospective employer.

55. Had Defendant followed reasonable procedures, it would have discovered that the inaccurate, stigmatizing criminal conviction belongs to another individual with a different Social Security Number and who resides at an entirely different address than Plaintiff.

56.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff Discovered that Defendant Mixed Him with Another Consumer**

57.     On or about August 11, 2023, Plaintiff received an email from SASS which stated that Defendant completed its employment report about Plaintiff and sold the same to Didlake.

58.     Shortly thereafter, Plaintiff obtained a copy of the subject employment report and was completely shocked and humiliated upon reviewing and realizing that the serious felony murder conviction of another, namely Convicted Felon, was published in the employment report Defendant sold about Plaintiff to Didlake.

59.     In or about mid-August 2023, Plaintiff contacted Didlake and explained that the murder conviction of Convicted Felon does not belong to him. However, Didlake informed Plaintiff that he could not start working without a corrected employment report and advised Plaintiff to dispute the inaccurate information.

60.     Plaintiff was very panicked, confused, and concerned about the impact of Convicted Felon's serious criminal conviction reported on the subject employment report – specifically, the impact of the same on the possibility to start his work with Didlake and on his future.

61.     Specifically, Defendant matched Plaintiff and Convicted Felon and published the criminal record of Convicted Felon onto the employment report about Plaintiff and sold that report to Plaintiff's prospective employer.  This exculpatory public record information was widely

available to Defendant prior to publishing Plaintiff's employment report to Didlake, but Defendant failed to perform even a cursory review of such information.

### Plaintiff Disputed the Misinformation in Defendant's Employment Report

62. On or about August 11, 2023, riddled with worry over the far-reaching impacts of being confused with a convicted felon, Plaintiff disputed the inaccurate information with Defendant. Plaintiff disputed via telephone with Defendant.

63. Plaintiff identified himself and provided information to Defendant to support his dispute.

64. Plaintiff specifically disputed the criminal record of Convicted Felon.

65. Plaintiff specifically stated that the criminal record of Convicted Felon does not belong to Plaintiff.

66. Plaintiff specifically asked Defendant to investigate and delete Convicted Felon's criminal record from any employment report about Plaintiff.

67. Plaintiff called to find out why the investigation was taking so long, and SASS told him they were working on it.

68. Plaintiff then began calling the courts and went online to do his own research to find out more about Convicted Felon.

69. Plaintiff found the Federal Bureau of Prisons website which contains the location of every federal inmate.

70. Plaintiff discovered that Convicted Felon is currently incarcerated and is 57 years old (Plaintiff is 60 years old).

71. Plaintiff sent all the information he had found about Convicted Felon to SASS.

72. On or about August 25, 2023, Plaintiff finally received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute and removed the criminal record from the subject employment report.

73. Defendant also communicated to Plaintiff that it had issued a corrected employment report to Didlake.

74. On or about September 20, 2023, Didlake emailed Plaintiff that he had cleared the security process and provided a start date of September 25, 2023.

75. Thanks to Plaintiff's perseverance and efforts, the job offer remained in force, and he was able to start working with Didlake on September 25, 2023.

76. Despite the fact that Defendant finally provided a corrected report, Plaintiff reasonably believes that due to Defendant's inaccurate reporting Didlake formed a negative opinion about Plaintiff after initially thinking he was a murderer.

77. Besides the fear of losing a good-paying job with Didlake, being falsely represented as a murderer had severe emotional and psychological effects on Plaintiff. He experienced stress, anxiety, and fear of damage to his reputation.

78. Because Plaintiff had been unemployed for a year (while earnestly seeking employment), he was thrilled when he was offered the position by Didlake. He finally thought his luck had changed for the better.

79. Plaintiff was also relieved because the long, unexpected unemployment had caused him financial distress and he had been stressing over his bills.

80. Seeing the report that he was a murderer, and having his employer see that was devastating to Plaintiff, as was the near loss of his job, especially after being unable to find a job for a year.

81. Furthermore, Defendant's false report may have led to negative perceptions, loss of trust, hostile work environment, strained relationships with Plaintiff's employer and could impact future opportunities for growth and advancement.

82. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

83. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

84. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

85. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

86. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

87. At all times pertinent hereto, the above-mentioned employment report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

88. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Plaintiff as well as the information it published within the same.

89. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

90. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

91. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

Respectfully submitted this 28th day of December 2023.

>*/s/Susan Mary Rotkis*
>Susan Mary Rotkis
>VSB 40693
>AZ Bar 032866
>Consumer Attorneys
>2290 East Speedway Blvd.
>Tucson, AZ 85719
>T: 602-807-1504
>F: 718-715-1750
>E: srotkis@consumerattorneys.com
>*Attorneys for Plaintiff*
>*Nathan Mott*